Warden v. Jefferson. We'll hear first from Ms. Graham. Your Honor, may it please the Court, my name is Sabrina Graham. I'm here on behalf of the respondent asking this Court to reverse the lower court's grant of relief regarding petitioner sentence. This Court was sent back, I mean this case was sent back to this Court and then to the District Court by the United States Supreme Court. You may have had that right to start with, Ms. Graham, so go ahead. The United States Supreme Court sent this case back for the determination of whether or not the State Court's fact findings were entitled to deference under pre-AEDPA 2254D. The District Court decided that those fact findings of the State Habeas Court and the Georgia Supreme Court were not entitled to deference under D-2, 6, and 7. We got all that. You need to get to your argument against the District Court order. Sure. Yes, Your Honor. I think when you look at the full record that was before the State Habeas Court and in the Georgia Supreme Court, it's clear that petitioner was provided adequate fact findings and a full and fair hearing. In the State Habeas Court, petitioner had three and a half years of discovery before he was given a two-day evidentiary hearing. At the evidentiary hearing, it's clear that the State Habeas Court was fully engaged in the record and understood the claims. Following that, petitioner and Respondents Council both filed post-hearing briefs. Let me ask you a question cutting to the chase. What are we to make of the fact that the State Habeas Judge in an ex-party manner asked the prosecutor for an order? Just telling him what the result was and providing apparently no other guidelines, considerations, findings, or anything. What are we supposed to make of the fact that he did it on an ex-party basis? And what are we to make of the fact that the order that the judge signed verbatim followed the first order, the proposed order from the prosecutor changing only the introduction and the conclusion, but included twenty-one mistakes? Well, first of all, I would state . . . Like spelling errors and stuff like that. Sure. First, I would state that it was the clerk that called Ms. Paula Smith and asked for the order. And as it had been twenty-five years, their memories were quite dim on that. I will state that all that they can remember was that the court had made its decision that it wanted to deny relief. And at that time, the court had before it a hundred and sixty page post-hearing brief from Petitioner's Council. Right. But we're starting out in a position where, to the extent the District Court was You got to show me they were really wrong or otherwise I'm bound by them. So he makes findings of fact about this, right? Yes. And I agree, Your Honor. And I think that those findings of fact are an error. And the reason for those findings of fact is that it starts off with the presumption that the trial court did not read that order. And we have no direct evidence in there. I realize there are some grammatical errors in the forty page order. But when you read the order, and at that time, I think it's important to point out that the order was provided hard copy. This wasn't in the time of email when it was sent to them. But the court had a forty page order. It made specific findings of fact and conclusions of law that all mirrored the arguments that had already been made to the court. For all we know, the trial court informed his clerk to tell Ms. Smith that, hey, I want an order that mirrors your post-hearing brief. We just don't have a very clear record of that. Or for all we know, he told her, just give me anything and I'll sign it. It could be. But as I state in the brief, trial courts are assumed to know and follow the law. And based upon a few Scrivener's errors in an order, we're saying that he absurd his role as a judge. And I would think that that was, is an error. But even assuming that you have a problem with the way the state habeas court signed the order, you still have the fact findings of the Georgia Supreme Court. Before we get to that, I asked two questions. I said, one, what inference, if any, was the district court free to draw and ought we to draw from the fact that the request was for an ex parte draft rather than he gave notice to both sides? Sorry, I didn't answer that. You're right. I'm sorry, Judge Marcus. I would say as far as, I don't think there's any inference really to be drawn from the ex parte nature because Ms. Smith then took the order that she prepared, prepared a cover letter, which had stated exactly what the law clerk had asked for. That was because the prosecutor did the right thing. Correct. But that's not what I'm focusing on in my question. I'm simply asking, what inference would one fairly draw from a judge saying to one of the parties, give me an order, ex parte? I don't know of any inference you would draw necessarily from the fact that he asked for an order, an ex parte order. I mean, I think it requires you to look at the whole record here. If he'd, in this court's case. Might I draw the inference that the judge simply didn't want anyone to know that the draft came from the prosecutor? I don't know that the record bears that out because it was Mr. English who testified in his deposition, who was the clerk, and he stated, I asked Judge Newton, did he want me to call Respondent's Counsel and request an order? I don't know that that was necessarily, I don't know if the judge told him, don't tell the other side, or if this was something that the clerk just took upon himself not to inform the other side because the record is unclear as to that point. I mean, that's my understanding of the record. I think your second part of your question is, what inference, what can we do about the district court? Well, I think the district court, I think he erroneously starts off with the presumption either that the state habeas court didn't look at the order or just overlooked certain things in the order. And I think, again, that the law states that you assume that the court knows and follows the law. And here, other than a few Scrivener's errors in there, there's nothing here, no direct  And he had, in fact, read, I assume he had actually, the record is silent on that, but you must assume that he had read Petitioner's 160-page post-hearing brief and Respondent's post-hearing brief, which largely mirrored that order. And when you put all of those things together, and the fact that he did not sign that order until a month after Ms. Smith had sent it to him, it gives the firm impression that he did, in fact, do his job as required. But Do we have any evidence from the law clerk that he did anything with respect to that or at least discuss the matter in any way with the state habeas judge or to the converse was his testimony? I never spoke to him about it. I understood Mr. English's testimony to be that he did not know what the judge did. No, but he never talked to the judge about the case. He did not recall what he talked to the judge about the case on. That was my understanding. We don't know whether the judge read the order or not, do we? Correct, Judge Carnes. And so, that's a factual dispute that's subject to conflicting inferences, which are to be drawn by the fact finder, right? Correct. Which is the federal district court judge in this case. And when I read the . . . I reread the district court's order again, and in it, he doesn't specifically state that the judge . . . that the state habeas judge did not read it. He said . . . he put it both ways. He said, maybe he did, maybe he didn't. But at the end of the day, he thought that the legal determination, whether he'd received a full and fair hearing, that he had not. Well, what he said on page 9 is, these errors and issues invite the reasonable inferences that Judge Newton failed to review the proposed order submitted by Ms. Smith before executing the final order and failed to review the relevant evidence. Yes, and then later on, he states that there is . . . he does state it later on that he wasn't sure. I can pull that out later. I just don't have that in front of me. But to the extent that the district court's order depends upon a finding to that effect. Correct. Your position is that when a fact finder's . . . the validity of a fact finder's order depends upon an unstated resolution of a factual dispute, we infer that he resolved it in a way that supports the order. Correct, Your Honor. So, we would infer from this that the federal district court judge can resolve that factual dispute in a way that supports the validity of his order. Correct, Your Honor. Which would mean that he resolved it in a way that indicated that Judge Newton did not, in fact, read and review the order. And I understand there's a very high bar there regarding the fact finding. I understand that. And like I said in our brief, we just . . . Of course, he had to do something because he put something in at the beginning and the end that wasn't in the order. Correct. Correct. But, and again, I just go back to what we stated in our brief, that if you're left with the firm conviction that the fact finding is an error based upon the totality of the circumstances here, then you can overturn that fact finding. But if this Court is disinclined to do that, then it is still our position that you have the Georgia Supreme Court making fact findings in this particular case that are also entitled to deference. But the Georgia Supreme Court said it was deferring to the fact findings of the trial judge. But it was also only deferring to those fact findings unless they were clearly erroneous. So therefore, that Court was also looking at those fact findings and specifically the fact finding that is at issue in this case regarding Judge Shuster and Dr. Dudley. But insofar as it made its review, it said, A, we're only looking at it for clear error, B, we find no clear error, and therefore, C, these are the operative facts. Right? Isn't that a fair way to analyze what they did? I would take issue with that, actually, because you're stating that, first of all, the Georgia Supreme Court adopts a lower court's findings of fact unless they're clearly erroneous. So those findings of fact rise up to the Georgia Supreme Court and become their own. Secondly, I think in this particular instance, the Georgia Supreme Court was put on notice that Petitioner had a problem with the way that the order was signed, specifically with regard to this credibility determination. They reviewed that, they reviewed the record, and they specifically stated in their order that Judge Shuster had this phone call with Dr. Dudley, and this is what Judge Shuster surmised from that phone call. So they were making a specific fact finding. And they had a 190-page brief. Correct. Presented by the Petitioner, which covered everything. Correct. It did. So they had all of that before it, and to say that We would give it a presumption of correctness under Cabanavy-Bullock if, indeed, they had made findings themselves. But if all they did was review the findings by the state habeas court, the trial court, and said there was no clear error, I'm not sure that that's tantamount to saying that they made an independent finding. What am I missing? Well, again, I would go back to the fact that the argument was made by Petitioner regarding the circumstances under which the order was signed. Then the Georgia Supreme Court looked at the manner in which the order was signed. And then it also made its own findings of fact regarding that credibility determination. I understand it also had the fact findings of the lower court, but it's looking at the lower court's order to determine whether or not they're clearly erroneous, and if they aren't clearly erroneous, then it adopts those fact findings. So I don't see how it wasn't an independent review there of the record and of the issue specifically as to the credibility between Judge Shuster and Dr. Dudley. And in this court's original opinion, which I realize was made by the- Well, let me ask you this question. There was a powerful credibility question that the trial court had to answer. Who do you believe? Do you believe Dudley or do you believe Shuster? The trial court, the state trial court, plainly believed Shuster. He says unambiguously in his order that the expert led Shuster to believe it would be a waste of time to explore it any further. Does the Supreme Court of Georgia make a credibility determination as between the believability of the one or the other, or do they just adopt that credibility finding made by the trial judge? I don't think they can just adopt a fact finding of a court without reviewing it and without reviewing the record. But if they're reviewing it for clear error. Correct. And in this particular case, you had, if you look at what the state habeas court had before it, it was the live testimony of Judge Shuster and an affidavit from Dr. Dudley. So the Georgia Supreme Court isn't in a much different position than the state habeas court in the sense of determining Dr. Dudley's credibility because that was on a cold record. So I still think that they do make an implicit finding there that that conversation happened. Therefore, I think that was explicit in an implicit credibility finding there that Judge Shuster said he had that conversation. And Judge Shuster has testified to that now for 25 years, that they did in fact have that conversation. Let me ask you this. Even assuming that everything that the attorney said was true, his representation still arguably falls outside the wide range of reasonable professional assistance. In other words, you had a kid and, you know, we used to see all the time, oh, in mitigation, the defendant, you know, I know it was a horrible crime but when he was four years old, he fell off the porch and hit his head. And everybody fell off the porch and hit their head and we ended up on death row, it seemed to be. That was the way the prosecutors dismissed it. But here you've got a guy who indisputably, when he was a little kid, was run over, his head was by a truck. And why in the world? And still had a scar on his skull, misshapen skull, I think was the way it was referred to in the original record. But why in the world wouldn't you present that and seek to get some expert testimony? I know Mama referred to it in passing, but they didn't have an expert talk about it and the kind of damage it could be done on it. Well, I think when you look at the record as a whole, that you can't say no competent counsel would have acted as trial counsel did. And under the mandate of Strickland, I try and put myself in the role of trial counsel at that time, looking at what they knew, their resources and the time that they had. At that particular time, they knew he'd been hit in the head. They knew, and I would dispute that it's a truck. Not hit in the head. I thought the testimony was his head was run over. I think she may have said that, but it wasn't by a truck. I don't see the truck in the record. The truck is in the red brief, but at least on the head. Correct. But again, they knew that he'd had that injury. They had him evaluated. They had no clue from talking to him, and they interacted a lot with him. They had no evidence there that he had any mental health issues. They didn't see it. Well, they had evidence that he could suddenly and mercurically change moods and get angry. No, they had one episode where he refused to meet with a mental health expert, which could have been for a myriad of reasons. He could have just been upset that day. But what he said was, you didn't make an appointment with me. Maybe he did make an appointment with him. People who are locked up and they're awaiting trial for a death penalty trial, I don't think it's unreasonable to say that they may not always want to meet with a mental health expert or whatever expert. But again, looking at the full record there, they had no strong evidence here of mental health issues. Nothing from the family saying he had any mental health issues. He'd had jobs throughout his life. He had been in the Navy. Trial counsel was very clear that they did not see any issues regarding mental health. They had him evaluated. Dr. Dudley said in his particular report, they found that to be not helpful because it said his decision-making capabilities were not impaired and that he had no mitigating personality features. And whether or not they had that conversation or not, they still looked at it. They had a client who was adamantly stating that he did not commit that crime. And whatever they did once they got to the sentencing phase, it's clear from their testimony that their theory going in was that he was innocent. And they argued that hard in the guilt phase. If counsel did not testify that Dr. Dudley had an oral conversation in which Dr. Dudley told him, never mind, there's nothing there, that would be ineffective assistance from the performance phase, would it not? I disagree because you're only looking at one chapter. Everybody says, here, I've checked this, I've checked that, but I think a further exam would be worthwhile. And a further exam is readily available, everybody agrees, and could have been done. You think that just because you're one expert that you're relying upon to give you an evaluation says, look, this would be worthwhile, getting this kind of examination, it's not going to cost you anything. Well, actually, we don't know that, Judge Carnes. We don't know that it wouldn't have cost them anything. Well, do we know that it would have cost them anything? Maybe so, because they were 14 days out from trial. That report was turned in on February the 10th by their expert. What would it have cost them? I'm just saying they only had 14 days to prepare. You're talking about time or are you talking about money? I'm sorry, I'm talking about time and resources. They had 14 days to prepare, they did not have strong evidence, that report does not That's how they viewed it. And they thought that the last part, which was at the end, tacked on the end, wasn't enough for them to keep pursuing that avenue when they had other avenues they needed to go down. Why do you rely on your brief on the fact that, or at least have relied in the past on the fact that Dr. Dudley allegedly told him, no need to look any further, he's just a criminal. But counsel never asked why Dr. Dudley put in the report. It would be worthwhile to have this examination and then went 180 degrees contrary on the phone in an informal conversation and said, never mind, he's just a criminal. I don't know that Mr. Schuster was specifically asked whether or not he Whether he was or not. There's no evidence that Schuster asked Dudley. Why have you changed your mind? You said it was worthwhile and now you're saying it's not worthwhile. The man's on trial for his life. Give me an explanation for your change. Well, in that particular instance, then I would say that the court is assuming that Petitioner did not, that Petitioner's trial counsel did not act in an effective manner, which is against Strickland, which states that you are presuming I'm not presuming that he did, but there's no evidence that he asked for any explanation. No evidence at all. And he's got to explain, once he's challenged on it, why didn't you do this? And I think he thought his explanation was, I asked him about that part of the report and he said that he did not think that further evaluation would be helpful and that he was just a criminal. And when you And he didn't, as far as we know, he didn't ask, but then why did you say it would be worthwhile? Honestly, I couldn't say if he did or not one way or the other because the record That's why I said, so far as we know, he didn't ask him that. Correct. Yes. And I realize that I'm over my time, so I'd ask that this court overturn the district court's ruling. Let me ask just one final question of you in this respect. Once we get over the issue of whether or not there's a presumption of correctness, and let's just assume, from my question, there isn't, for the reasons we've talked about and the district court found, and the district court is writing essentially on a clean slate and we're obliged to defer to his fact-finding, not his conclusions of law, not mixed questions, but pure fact-finding, what are we to make of the fact that Chella, the other defense lawyer, admitted that his failure to have further testing was the result of inexperience rather than strategic determination? I should have followed up on that, and had I had more, if this had not been my first death penalty case, I expect I would have. So you have one of the two lawyers saying, I screwed up, I should have done more, I didn't do more. And then you've got Schuster saying, no, no, I went back, I spoke to him, and Dudley told me it would be a waste of time. But what are we to draw from, and what could the district court fairly draw from the fact that the other defense lawyer said there was nothing strategic about it, it was a mistake, period? Well, answering your first question, what you can draw from it, I would say you have to look back at the State Habeas Court testimony of Mr. Chella. And in the State Habeas testimony, he stated that he did speak with Dudley. He wasn't specifically asked in that particular portion of the testimony if he talked to Dudley about that part. In fact, he was never asked if he talked to Dudley about the statements that were at the end of the report. But he stated, you know, we talked to Dudley, and then he was asked, did you consider doing further evaluation? And he specifically testified, no, we did not, because we were going on the residual doubt theory, the theory that he was innocent, he was adamant, and also because he had not been cooperative with Dudley. So he gave a different answer in State Habeas, which was only five years from trial, than 30 years from trial, he says, oh, I didn't, you know, I don't remember that. But his answer in State Habeas didn't make any sense. It's refuted by the record. They didn't go on residual doubt. They didn't go exclusively on residual doubt, and they did a pitiful job of doing anything on residual doubt. They put him on the stand. He didn't even deny, wasn't asked to deny, that he committed the crime. So he didn't even suggest there's any basis for doubting he committed the crime. And then, then they put in all the mercy mitigation evidence. I don't understand how that evidence strategically is any different from him having all that skull damage and brain damage. Well, again, I would go back and put myself in the place of counsel at the time of trial. When they went to trial, it was clear that they were attacking the innocents and that residual doubt was their strategy. Like all good plans, once you hit contact, sometimes they break apart in court. They were clear that their testimony from State Habeas was that residual doubt was their strategy. Now, I can't say that when they got to the end of their closing arguments that they did not back off on that residual doubt, but that may be because they were looking at 12 members in a box who were giving them, you know, dirty looks, and they felt like they needed to have some credibility with that jury. There was no surprising evidence about guilt at trial, was there? No surprising evidence? Yeah. There was no secret witness for the prosecution who came in and blew the defendant's theory of residual doubt out of the water. But I think... They knew going in... Well, they did actually argue there were a couple of witnesses they felt like this. But they brought them in at the last minute. But having put that aside, trial counsel vigorously defended him during the guilt-innocence phase. I mean, they questioned all of the witnesses. They did a bang-up closing argument on why he was innocent. Right. But what are we to make of, and the district court made a whole lot of, the fact that there was not only a square collision of fact between Dudley and Schuster, but that there was a And again, I would state that... He makes something of that. He did. And I understand. That leads him to draw some inferences and make some determinations. Correct. Which presumably are entitled to deference on clear error review. And you know, I understand there's a high bar there. And again, we would just state that in this particular instance, you have Mr. Selle given testimony five years after trial, and Mr. Selle given testimony that's 30 years after trial. And I don't know of any precedent that states that you have to give one ... No, all I'm saying is the district judge says in words of substance, I give less credit to Schuster and more credit to Dudley, not just between the two of them there was a difference, but because Schuster and Selle collided as well. That Schuster's account wasn't a clean statement from the defense team. It was at war with the account given by the other lawyer. It wasn't at war in the original state habeas hearing. There was only this discrepancy when they got to... No question about it. But when they got to the district judge, and that's why I preface my question saying assuming we get to that point and the presumption disappears, at that point we're now in district court and the trial judge is making a fact-finding determination based on what he heard, and he heard them all, right? Yes. Yes, they all testified. He wasn't relying on an affidavit. He heard Dudley live, Schuster live, Selle live, correct? Correct. Yes. Yes. And so I would state there that if you go by Mr. Selle's testimony, it doesn't necessarily contradict Mr. Schuster's testimony in the sense that Mr. Selle said, I did not talk to Dr. Dudley. And he doesn't... He says that he didn't follow up, but he doesn't say that Judge Schuster didn't follow up with him. Got it. Thank you. Thank you. Thank you. Mr. Earle. If it may please the court, along with Jack Martin, I represent Lawrence Jefferson. In this case, the jury was not told a very compelling mitigating evidence that, as the case, obviously, where Mr. Jefferson suffered from organic brain damage as a result. What is the evidence in the record that the brain damage was causally related to the murder? Well, I don't think it has to be... What opinion was rendered with reasonable medical certainty that the brain damage played a role in the murder? Well, I think Dr. Marikangas testified that Mr. Jefferson had, I don't want to use his own, a lifelong and profound... The brain damage had a lifelong and profound impact on his behavior. I understand that. But is there an opinion in the testimony? I couldn't find one, which said that the brain damage was causally related to the murder. I don't think it says it caused it, but I think both experts say that he, as a result of his organic... I understand he had a lifetime problem. But they say he had diminished capacity. And if you look at what Dr. Marikangas talks about, he's got diminished impulse control, which could be argued, it doesn't have to be, but could be argued to go to the crime to explain what would be an otherwise inexplicable crime. Transient outbursts of rage, which are inconsistent with his normal pattern of behavior. What your argument is, it ought to have been presented in the guilt phase then. It was that strong. The opinion testimony was that strong. I don't think this is a guilt phase issue, and I don't think this is inconsistent, even with residual doubt. I don't believe they pursued a residual doubt. I'm talking about causation. What I'm saying is, you don't have to have causation to put it in the penalty phase. This is not a guilt phase issue. No, no, no. Let's put it this way. The question I have is whether or not, if the case were retried with the same overall evidence, that the jury would be faced, on the one hand, with nothing for causation, but just somebody who's had brain damage, but committed the murder, as if he had cancer or some such thing. The other scenario would be, it had a causal relationship to the murder, but for, I'll put it that way, it caused the murder.  I think you could say it contributed to it, if somebody chose to use that as a strategy. The district court's task in deciding prejudice in this case was to take all of the evidence that was presented at trial, all of the evidence that was presented in the state habeas proceeding, all of the evidence that was presented before the district court, all of that evidence together, take the best part and hypothesize a new penalty phase. Correct. Okay. And then also hypothesize the state's rebuttal of that case. Do you think the judge did that? I think he did. You do? I think what he says was the organic brain damage would explain... No, no. I'm talking about a re... Right. I think his finding is... The law requires for a prejudice determination that all of that evidence be put in the pot, as it were, and the case effectively retried with that evidence. Because sometimes the new evidence of mitigation is so impeachable that there's no prejudice. So you have to confront that problem, and I didn't see that. Well, I think he did. I think he talked about... The respondent presented a counter-expert, Dr. Maciacci, who testified, and the judge said... Weighed them both. In my reading of it, seemed to give a little more credibility to Dr. Merikangas and Dr. Price, who are... I think we're cross-purposed. Go ahead with your argument. Okay. I think I'm not communicating. Okay. It could be on that hearing. Well, no. I'm sorry. I think what he did, and he said... He recognized... I understand that he dealt with the evidence that he had there. I'm talking about reconstructing the penalty phase by taking everything that had been presented. Then you take the best part of the evidence for the petitioner, you say, well, they'd only present that, and then you take the rebuttal evidence, the cross-examination of the State, and then decide whether or not there's prejudice. I didn't see that, but I understand your point. I think what he did was he talked... In large part, adopted the position that Judge Carnes took in dissent the first time around about the residual doubt and how there was actual... It was not just a residual doubt, but there was a mercy component of it. This was consistent with that. Then he took the evidence that we presented and talked about how the evidence we had and that there were problems with Dr. Maciachy's that would be subject to cross-examination by the defense, and the State would have a competing expert. He considered everything. Also, there was a problem with the lay witnesses who would provide the testimony for Dr. Price and the other doctor whose name I can't pronounce, because their testimony would be impeachable. Well, every family member, I think, that testifies on behalf of another family member suffers from some impeachability, if you will. So I think it's there. Those were the people... And that's something else the court should have talked about. I think he... Because it was the underpinning of the expert's opinions. Correct. Okay. But we're not grading the papers of the district court so much. I know lawyers have something to argue about because they have the district court opinion. And that's a de novo review on our behalf anyway. The prejudice prompter. Not the credibility issues, but on whether or not given all this, given the totality of the evidence from all the proceedings, there would have been sufficient doubt to undermine our confidence in the outcome at the sentencing stage. Right. And obviously the standard is there's a reasonable probability that post Wiggins that there's a reasonable probability that at least one juror, because of Georgia's sanction, would have struck a different balance. What the Supreme Court also said was, what does reasonable probability mean? First of all, it doesn't mean the probability. We just say that to confuse you. But what it actually means is, does it undermine our confidence in the outcome? Correct. And here I think confidence is undermined. I think it is a relatively unaggravated crime, if you will. I venture a guess that in today's day and age, I doubt that they would even bring it as a death penalty case. There's one victim. I believe there was testimony from the medical examiner that after there was a blow to the back of the head that he believed that the person was unconscious. The aggravating factors are that there was a robbery or that it was committed during the course of another felony, a B-2 aggravator, that some money was taken from the victim. So I think it's relatively unaggravated. Also there was considerable work to do with a few of the state's key witnesses, the Glades and Dwayne Mitchell. So anything, I mean, I think the bar is not that high on what could have tipped the balance for the jury. And I think you had some very compelling evidence that talked about, and actually I think went with, if you will, I think, Judge, you called it mercy, assuming guilt, that type of strategy. This is another reason for mercy, even if you don't connect it to the crime. You can talk about how, through no fault of his own, he was run over by a car or a truck or an auto when he was two years old, and as a result has had lifelong difficulties. And that's what was more fully developed in the state habeas hearing when Mr. Jefferson's was spoken to for more than probably the hour or so that they spent, the trial attorney spent in Kentucky three days before the trial. Let's go back to the question Judge Schofield asked you, if we can, Mr. Hertel. The question was, as I understand it, whether either of the mental health experts, Merrick Angus or Price, in words or substance, said or strongly suggested that the frontal lobe organic brain damage would have caused or played a part in explaining the homicide, the conduct of Jefferson. Not that it might have, not that it could have, but in fact that it did play some part. I don't think, I cannot recall, but I don't think explicitly any of them said it. They talked about the deficits and the associated problems related to it. They did, I know Dr. Price talked about how the deficits and the problems, the frontal lobe damage, could have explained what Mr. Sella described as Mr. Jefferson's horrible trial testimony. Because when I looked at Merrick Angus, among other things, he said, one, Jefferson suffers from this injury, two, it was caused by, in his opinion, the accident when he was two, three, it changes the behavior of such a person, four, it means that he's, quote, less morally culpable because he's less able to control his behavior. And then he says, however, quote, if Jefferson hit someone over the head with a log, it might have been a momentary fit of rage, the operative verb being might have, which was not as controllable by someone who was impaired as it would be in a normal person who would have simply spoken to the man and worked it out in some other way. Then he says, in the absence of any psychopathic or sociopathic tendency in Jefferson, and made it more likely that an occasional violent episode was the result of brain damage. I think that's about the best you get. Would that be a fair statement? I would think that would be about the best. I don't recall anything. I didn't recall that specific passage, but I think that's probably about as close as you come to a causation. Do you have to show causation to succeed? And if the answer is no, why not? Dredge v. Trenard. In terms of, as Judge Chauvet properly observes, you've got to take all the old, all the new, put it in a hopper, shake it up and say, is there a reasonable probability, i.e., sufficient to undermine confidence, the result would have been different. That is, one juror reasonably probably would have gone the other way. Well, first of all, legally, no, because Trenard v. Dredge says there needs to be no nexus between the mitigation and the crime. So there has to be no nexus. You don't have to show causation. The jury can, and in Georgia especially, the jury can consider anything as mitigation and they can impose a life sentence for any reason or no reason whatsoever. I understand where you're going. I think I agree with your point, but actually, in that case, it was talking about what was mitigation, not the power and effect and weight to be given to the mitigation, were they not? Correct. What is mitigation? Anything can be mitigation. You're right, you don't have to have a nexus. I think there could have been a nexus. An expert could have, Dr. Merikangas says, if this happened, it could have been because of this or in and of itself, it's mitigating. So your argument has to be what was different is the profile of the defendant was completely different. Correct. And that was what yields the reasonable probability that one of the jurors would have gone the other way or at least enough to undermine confidence. Correct. The jury was allowed to presume, because there's no evidence to the contrary, that he was a normal individual that, I'll use the terms from Mr. Stella, who inexplicably killed an innocent person. So, they were allowed to think that he was in full control of his faculties, no problems, and this happened, where this type of mitigation evidence puts him in a different light and puts the entire case in a different light, because now you have a reason, if they're looking for causation, you have a reason that this might have happened. There's brain damage, as Dr. Price says. His brain doesn't work like an ordinary brain works. There are problems with it that affect his behavior, and these are problems that he's had throughout his life. His family described some of the problems that he had. He would fall out, he would just, for no reason, go unconscious, standing up one minute, on the ground the next. That type of thing is classic mitigation, it's classic. It's exactly what the jury needs to decide a life and death decision. Counselor, that sounds like a mercy argument. That could be. I mean, a mercy argument, just have mercy on somebody who's suffering from this problem. It could be, and that's why I say it could be. It would have been a consistent theory, even if they were going for residual value. Well, that's what I posited in the first place. It just seemed to me to be a mercy argument. Not something that had a significant role in the murder, I'll put it that way. Well, that's one way you could spin it. I think you could also have this, the hallmark characteristics of frontal lobe damage, you could use to explain why this inexplicable crime might have happened. If you weren't going with the residuals out there, if you wanted to do this. I looked through the testimony of these experts to see if I could find something, for example, that would have justified calling them in the guilt phase on the issue of premeditation or such. I may have misunderstood. I don't believe there's any reason to call them in the guilt phase. That's why I see this as a mercy argument, unrelated to the murder. Okay. I understand your question now, I'm sorry, Judge. I think, as the court talked about earlier, we clearly have, with the new fact findings of the district court, a deficient performance, we've met the deficient performance prong. I think we have a whole host of red flags that the trial attorneys should have followed up on. As the court noted, as Judge Carnes noted, he had the reported head injury, you could see the scar. There is a cranial indentation that's a misshapen head is exactly right, I think, from encephalitis. You have, and I think the important comment that you were talking about before, Judge, was after that outburst at the jail, when, and I think this is what's really important, where Judge, Dr. Dudley described Mr. Jefferson's behavior as agitated and disoriented, or disorganized, I think. When confronted with that, Jefferson's response was, I'm sorry, I get that way sometimes. So it's not an isolated episode. I get that way sometimes, man. Yeah, man. So that's putting him on notice that this isn't a one-time episode. I think what's really, I think, very important, and we didn't talk about it, is the statement that he gave to police. I described it the other day to one of my colleagues as incoherent, and she said that it didn't do it justice. I'm reading from the notes, it's Petitioner's Exhibit 13. These are the notes to the police officer. I don't need to be around people. I need to be executed. I talk to myself. I ain't crazy. I don't know nothing. I got hit by a car when I was a kid. I can't read the last of that one. I saw a man in my dream. I call myself Tony sometime. I don't think I'm two people. How quick can I be put to sleep? I don't feel like anything about this. That statement, after he's been arrested, it's a custodial statement in response to being confronted with the police saying, we're charging you with this crime. That statement alone would cause somebody to do mental health stuff. But now, on top of it, we've got Dr. Dudley. But of course, they did do mental health stuff. They brought in Dudley. And then Dr. Dudley said, I find this, but I suspect organic brain damage, and we need to do neuropsychological testing to determine if there's an organic ideology. No reasonable attorney, given those facts, would have just punted. No reasonable attorney would have failed to follow up on that, regardless of whether it's two weeks from trial, two months from trial, or two years from trial. Time and resources. The time would only be, hey, Dr. Dudley, or go down and do neuropsych testing. It's not any time for the attorneys. It's Dr. Dudley's time. And I think you're right. I didn't think the record established that Dr. Dudley could do it. Pardon me? I didn't think the record established that Dr. Dudley could conduct the examination himself. I think one of his affidavits told them, said that he told them he could do neuropsych testing, and I don't know if it's the same affidavit, because I think he submitted two or three. And one of the affidavits then also said it would cost between $700 and $1,000. I'm sure of that. And I'm not sure it's the same affidavit. But in one of the affidavits, I'm relatively certain that he said he could do the neuropsych testing. And I think he even, I'm thinking back to the Federal Habeas Testimony, I think he said he was board certified in neuropsychology. There's somewhere in your brief, I'm just curious, not that it matters. I think I made a mistake. Well, moving on from that possibility, I always understood that it was the car that hit him in the head or rolled over him and whatnot. I thought I read in your brief somewhere recently that it was said a truck. I think that was in Dr. Merrick Hange's affidavit. That's where I recall seeing it. And I may have reproduced it as a truck. But the mother testified car, did she not? A car. Car hit him. So it is a car. It is a car. Okay. And his statement says an auto. It looks to me, it's a handwritten note. So it looks to me like an auto. And it was one instead of four or five, as I said. Wasn't he one year old at the time? Two. Two. Two years old. Okay. So I think the district court was entirely proper and the record clearly establishes that counsel didn't perform adequately. I'd like to also, Judge Marcus, you talked about the conflict that the district court resolved between Dudley and Sella. It wasn't just that Mr. Sella said, I didn't have a phone call with Dr. Dudley. There was also, and I think this is important, billing records from both Sella and Schuster that don't reflect any post report conversations. And there was also. He had an explanation for that. Pardon? He had an explanation for that, did he not? He just said, he made a comment that he didn't know. He was never confronted with it. He did say. An explanation. He had an explanation about the billing. He said at some point, it might not be complete. I might have done more than. But I think it's interesting to note that all of the phone calls that he had, he's talking about. In other words, he impeached himself, is the argument. I think the records impeach him. Okay. Right. And I think Mr. Sella's records also show phone calls before the report. I think his were in November where Mr. Schuster's were in December. And no phone calls after, I want to say it's January or February when the report is done. So, and then you have, and I think this is important too. It goes to the, both the Butts Superior Court order and then the George Supreme Court never mentioned the fact that Dr. Dudley specifically said, I never told them not to pursue neuropsych testing. I never told him he was just a criminal. The Butts Superior Court order doesn't make mention of it and neither does the George Supreme Court order. So, I think there are no new fact findings. The law suggests, going back way back when the time frame obtained here, that findings by the highest court of the state are entitled to a presumption of correctness, independent of any deference that we might give to the trial court. If the appellate court makes findings of fact, they are presumptively correct. How do we review the findings of the Supreme Court of Georgia? They did not make fact findings. I think this quote, particularly of the Georgia Supreme Court, the 45-page order in this case is well supported by citations to the record and adopted by the habeas judge as his own. We decline Jefferson's invitation to accord the order less deference than mandated by OCGA 911.52. 911.52 is the statute that says that findings of fact shall not be set aside unless clearly erroneous and due regard shall be given to less clearly erroneous. They also say the same thing in the second paragraph of Chief Justice Clark's opinion. Jefferson complains it was ghostwritten and he argues that we should therefore review this case de novo or at least under a lower deference standard review than the clearly erroneous standard of 911.52 and they declined to do that. Your argument is all they found was that those were not clearly erroneous, not that they were the actual facts or that contrary polar opposite facts would have been clearly erroneous. Correct. All of which feeds back into the full and fair opportunity. Correct. Your argument is the Georgia Supreme Court does not make fact findings. Well, they can. I think they can, but they didn't in this case. My point is under habeas law, we could never take a court presumption of correctness to a Georgia Supreme Court discussion of the facts because it doesn't make fact findings. Well, that would be wrong. Under Georgia law, it doesn't make fact findings. It just determines whether or not there was enough evidence for the fact. I can imagine a scenario where the Georgia Supreme Court finds that the lower court fact findings are clearly erroneous and then makes its own fact finding. Well, I understand. That's different, but I'm talking about where they don't do that. Right. There's no presumption of correctness. There's no presumption of correctness. Under Georgia law. Under Georgia law. And I think under pre-ADP, ADPA habeas law, there's no presumption where there's not a full and fair hearing. Anything else, counsel? One second. Mr. Martin points out, and I'll let Judge Goh flat it. The court noted, the district court noted that the expert testimony of Dr. Price and Mayor Kangas would have, one, offered an explanation, albeit not a justification for how an otherwise largely inexplicable crime could have occurred. Two, substantially impacted any mercy-based jury decision-making on sentencing since it figures directly into the state of the murderer's mind. And three, weakened the aggravating circumstances of the crime. So I think the court is trying to consider all of the evidence, both at trial and that was developed on habeas. Thank you. Ms. Graham, you went over to start with, but we'll give you five minutes. Okay. Thank you. I'd like to clarify something you asked, Judge Carnes, just because I don't want to appear that I'm trying to misrepresent anything that the district court said. And I understand you're correct what he said on page nine. He states on page 14 regarding whether or not the state habeas court looked at the order. He says, this is particularly so given that the state habeas court's order references an affidavit that was never submitted in the case and contains numerous typographical errors that Judge Uden either never saw or overlooked. So that's what I was referring to. I just didn't want you to think I was misrepresenting. I understand. On your argument, and I'm paraphrasing it roughly, don't worry about the state collateral court ghostwriting because the Georgia Supreme Court made its own fact findings. As opposing counsel has pointed out and has also occurred to me, all the Georgia Supreme Court found was those findings would not be clearly erroneous. They didn't find that contrary findings would be clearly erroneous. They did not find that, no. But I would point to the section of the Georgia Supreme Court's order in which they discuss specifically petitioners, what they call the Blanco claim, but it's really just their Strickland claim. And Blanco was a case this court had decided years ago. And in that specific portion, they do state, and I do think this is a finding of fact. However, in subsequent telephone conversation with Jefferson's attorneys, the psychologist indicated that further examination would not likely be beneficial because Jefferson did not have serious mental health problems. Counsel explained that in light of this evidence, as well as their own observations of Jefferson and Jefferson's adamant assertion that he had not committed the crime, they concluded that there was no reason to explore further any mental health issue, I mean, I'm sorry, any mental issue or to call the psychologist to testify. Yes, but that's adopting the state collateral court's findings because they're not clearly erroneous. You don't just say, okay, there's no clear error in the findings below. You weave them into your opinion on appeal. Assuming that they're not clearly erroneous, but if they are adopted by the Georgia Supreme Court, then they become the Georgia Supreme Court's own fact findings. No, they don't. They become what the findings that the Georgia Supreme Court decided the case on because they were made by the trial court and were not clearly erroneous. You can't say we're going to review the facts only for clear error, not to determine what we would decide if we were the fact finder. Then when you're discussing the issues, magically they become your fact findings as opposed to the findings of the state trial court that were not clear error. I guess I misunderstand because in this court's original opinion, this court stated in a footnote that you also had to give deference to the Georgia Supreme Court's fact findings and then the court said the Georgia Supreme Court found and they referenced those particular fact findings. They found those on the supposition that the state collateral court findings were not to be set aside because there was no lack of full and fair opportunity to develop the facts which the Supreme Court of the United States specifically reversed us on. Correct. But the U.S. Supreme Court did not take into account the fact that the Georgia Supreme Court had also reviewed this error. I will say looking at . . . So we should overrule the Supreme Court? No, I'm not saying that. It would have been strange indeed for the Supreme Court to send the case back to us and have us send the case back to the trial court to engage in this kind of fact finding if we were bound and they felt they were bound by the presumption of correctness by the Georgia Supreme Court. That is to say, if they actually believed that the Georgia Supreme Court had made its own independent findings rather than reviewing the trial court for clear error, there would have been no reason for them to send it back unless they were prepared to say that the findings by the Georgia Supreme Court were wrong, so wrong that we couldn't defer to them. And that's not what they do here. Admittedly, they don't say a word about the Georgia Supreme Court, so the inference is wholly implicit. Correct. I was just saying they did not say anything about the Georgia Supreme Court making fact findings. It makes no sense to say the state trial court denied the petitioner a full and fair opportunity to develop the facts. The Supreme Court of Georgia erroneously overlooked that, didn't consider it, didn't decide anything about it, and merely determined that those flawed and defective fact findings were not clearly erroneous and therefore were going to overlook the defect and the flaw in the fact findings. That is not sensible. And our argument is simply that petitioner had every opportunity to press his claim in both the state habeas court and the Georgia Supreme Court. You have to assume that the state habeas court did not look at that order and then you have to assume that the Georgia Supreme Court, it just seems to me they had a very, very fair opportunity to press their claims and they should be given deference. Thank you, counsel. We will take that case under submission. Thank you. All rise.